**NOT FOR PUBLICATION**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

- - - - - - - - - - - - - - - - - - - - - - - - - -X

In re:

MONCADA NJ SOLAR 201, LLC,   Chapter 11

Case No. 16-33967 (CMG)

Debtor.

- - - - - - - - - - - - - - - - - - - - - - - - - -X

**OPINION**

**APPEARANCES:**

**COLLINS, VELLA & CASELLO**
**Joseph Casello, Esq.**
Attorney for Debtor

**BECKER LLC**
**J. Alex Kress, Esq.**
Attorneys for ISE America, Inc.

**CHRISTINE M. GRAVELLE, U.S.B.J.**

**Introduction**

Creditors, ISE America, Inc. and ISE Farms, Inc. ("ISE") move for reconsideration of this Court's May 31, 2017 Letter Decision and Order denying ISE's motion to convert or dismiss the Chapter 11 bankruptcy case of debtor, Moncada NJ Solar 201, LLC ("Moncada"). For the reasons that follow the Court will grant the motion and dismiss the case.

### Jurisdiction

The Court has jurisdiction over this contested matter under 28 U.S.C. §§ 1334(a) and 157(a) and the Standing Order of the United States District Court dated July 10, 1984, as amended October 17, 2013, referring all bankruptcy cases to the bankruptcy court. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A). Venue is proper in this Court pursuant to 28 U.S.C. § 1408 and 1409. Pursuant to Fed. R. Bankr. P. 7052, the Court issues the following findings of fact and conclusions of law.

### Facts and Procedural History

As the parties are familiar with the underlying facts, they will only be briefly summarized herein. Moncada was formed for the purpose of developing a solar energy project (the "Project"). The Project was to be constructed on land owned by ISE. The relationship between the parties and/or their predecessors in interest began in July 2010, at which point Moncada began the process of obtaining various approvals required for the Project.

In 2012, New Jersey enacted the Solar Act at N.J.S.A. § 48:3-87 (the "Act"), which made the Project financially viable by providing tax credits for solar renewable energy. *See* N.J.S.A. § 48:3-87(q). The Project was awarded the right to these tax credits through the issuance of Solar Renewable Energy Certificates (the "SubQ Award"). The SubQ Award, given in January 2014 for Energy Year 2016, designated the Project as "connected to the distribution system" pursuant to the Act as of June 1, 2015. The Act imposed a deadline of no later than May 31, 2017 for the Project to "commence commercial operations." *See* id. at 87(q)(2). As required by the Act, Moncada caused $326,000.00 to be placed in escrow (the "Escrow Deposit") with the New Jersey Board of Public Utilities (the "BPU").

In December 2014, Moncada and ISE entered into a contract for sale of real estate for the acquisition of certain lots on which the Project would be completed (the "Contract"). The Contract allowed for Moncada to purchase the lots from ISE, then lease the land to the developer identified by Moncada to construct the Project (the "Developer"). The Contract contained various contingencies. Relevant to the present matter, the Contract required that Moncada obtain various land use approvals, and that ISE enter into a solar purchase agreement with the Developer. The Contract called for a closing date of December 31, 2015. Subsequent amendments to the Contract provided for closing by December 31, 2015, but further stated that in the event that no closing took place by April 1, 2016 that either party could terminate the contract.

The Project was beset by delays which resulted in ISE serving Moncada with a notice of termination of the Contract on July 29, 2016. ISE returned the deposit Moncada had made on the Contract and Moncada cashed the deposit check. Moncada has disputed the termination as improper as of no legal force and effect.

Moncada filed the present bankruptcy on December 16, 2016. On April 13, 2017, ISE filed a motion to dismiss the case. The bases for the motion were (1) that the case was a bad faith filing; and (2) that there was no reasonable likelihood of rehabilitation. The record was developed to indicate that Moncada had requested that the (the "BPU") extend the May 31, 2017 deadline for compliance with the SubQ Award, or to recognize that the automatic stay applied. The BPU did not respond to Moncada nor has it entered an appearance in this case.

In its initial ruling on ISE's motion to dismiss, the Court found that Moncada's bankruptcy filing was not done in bad faith as the purpose of the filing was to preserve the SubQ Award. The Court did not rule on ISE's argument that the SubQ Award had expired, rendering

any plan proposed by Moncada infeasible. But, the Court cautioned that any final determination as to the viability of the SubQ award would likely control this Court's ultimate decision as to feasibility.

The BPU took no action on or after the May 31, 2017 deadline for the SubQ Award. Unsurprisingly, the parties hold divergent views about the meaning of this non-action. On June 2, 2017 counsel for Moncada docketed a letter to the Court noting that, since there was no BPU action terminating the SubQ Award, and there was no forfeiture of the Escrow Deposit, the BPU recognized the effect of the automatic stay as preserving Moncada's SubQ Award.

ISE had a vastly different interpretation of the non-action of the BPU, using it as the basis for the filing of the present motion for reconsideration. ISE contended that because the BPU took no action on the SubQ Award, that it expired at 12:01 a.m. on June 1 by its own terms and the terms of the Act. Thus, the non-action was a new fact which provided grounds for reconsideration.

During the pendency of the present motion, New Jersey enacted a bill amending the Act by extending the deadline to commence commercial operations by May 31, 2018, effectively extending the SubQ Award for the Project for a one-year period (the "Amendment"). The parties submitted multiple briefs and engaged in extensive settlement discussions. After settlement talks broke down, the Court held oral argument on October 17, 2017 and is now prepared to rule.

## Analysis

Under 11 U.S.C. § 1112(b)(1), a court shall convert or dismiss a case "for cause." 11 U.S.C. § 1112(b)(4) contains a non-exclusive list of factors which constitute "cause." The factor most relevant to this decision is the first listed in that subsection: "substantial or continuing loss

to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation." 11 U.S.C. §§ 1112(b)(4)(A).

In light of the substantial amount of time between the filing of the present motion and oral argument, during which there were new developments in the facts of the case and in the applicable state statute, whether the motion is considered as a motion for reconsideration or a renewed motion to dismiss is a distinction without difference. The operative question for the Court to consider is whether, under the current facts and law, there is a reasonable likelihood of rehabilitation for this debtor.

As this Court noted in its May 31, 2017 letter decision, the feasibility of the case hinges upon the viability of the SubQ award. Thus, the issue of when the SubQ Award expires is of utmost importance in making a determination as to whether dismissal is appropriate. Subsection q of the Act reads, in part, as follows:

> (1) During the energy years of 2014, 2015, and 2016, a solar electric power generation facility project that is not: (a) net metered; (b) an on-site generation facility; (c) qualified for net metering aggregation; or (d) certified as being located on a brownfield, on an area of historic fill or on a properly closed sanitary landfill facility, as provided pursuant to subsection t. of this section may file an application with the board for approval of a designation pursuant to this subsection that the facility is connected to the distribution system. An application filed pursuant to this subsection shall include a notice escrow of $40,000 per megawatt of the proposed capacity of the facility. The board shall approve the designation if: the facility has filed a notice in writing with the board applying for designation pursuant to this subsection, together with the notice escrow; and the capacity of the facility, when added to the capacity of other facilities that have been previously approved for designation prior to the facility's filing under this subsection, does not exceed 80 megawatts in the aggregate for each year. The capacity of any one solar electric power supply project approved pursuant to this subsection shall not exceed 10 megawatts. No more than 90 days after its receipt of a completed application for designation pursuant to this subsection, the board shall approve, conditionally approve, or disapprove the application. The notice escrow shall be reimbursed to the facility in full upon either rejection by

> the board or the facility entering commercial operation, or shall be forfeited to the State if the facility is designated pursuant to this subsection but does not enter commercial operation pursuant to paragraph (2) of this subsection.
>
> (2) If the proposed solar electric power generation facility does not commence commercial operations within two years following the date of designation by the board pursuant to this subsection, the designation of the facility shall be deemed to be null and void, and the facility shall not be considered connected to the distribution system thereafter.

N.J.S.A. § 48:3-87(q). Subsequently, on July 21, 2017 the Act was amended and the following provision was added to subsection q (the "Amendment"):

> (3) Notwithstanding the provisions of paragraph (2) of this subsection, a solar electric power generation facility project that as of May 31, 2017 was designated as "connected to the distribution system," but failed to commence commercial operations as of that date, shall maintain that designation if it commences commercial operations by May 31, 2018.

Id. This addition was the only substantive change to the Act.

The Amendment, at a bare minimum, extended the time for Moncada to complete the project to May 31, 2018. But, there is no dispute that Moncada is not be able to comply with that deadline and that, without the SubQ Award, Moncada has no reason to develop the Project. Moncada advances two arguments to support its position that there is a reasonable likelihood of rehabilitation despite the current May 31, 2018 deadline set by the Amendment. First, it contends that the BPU has the discretion to extend the deadline beyond May 31, 2018. Second, it submits that the provisions of the automatic stay preclude the BPU from taking any action to terminate its SubQ Award without first seeking relief from this Court.

BPU Authority to Extend

N.J.S.A. § 48:2-40(e) allows the BPU to "extend, revoke or modify an order made by it." Moncada cites to two New Jersey state matters in which the BPU's discretionary authority is

discussed as it relates to solar projects. In the first, decided prior to the Amendment, the BPU acknowledged that it had the discretion to amend the date of designation in N.J.S.A. § 48:3-87(q)(2), finding:

> Subsection q requires a proposed solar facility to achieve commercial operations within (2) two years of the date the Board has designated it as "connected to the distribution system" or forfeit its designation. However, the Legislature did not prescribe the date of designation by the board or indicate any limitations on the Board's discretion to set that date. Thus, the Board has exercised its discretion in designating these dates. Cf. Gloucester Cty. Welfare Bd. v. State Civil Serv. Comm'n, 93 N.J. 384, 390 (1983) (strong presumption of reasonableness accompanies administrative agency's exercise of statutorily-delegated responsibility); In re Adoption of N.J.A.C. 7:26B, 128 N.J. 442, 452-454 (1992) (ultimate question is whether agency's action is permissible under broad language of statute).

In the Matter of the Petition of True Green Capital Management LLC for an Extension of the Designation Date Set Forth in the Matter of Augusta Solar Farms (Docket No. QO13101014) Pursuant to N.J.S.A. § 48:3-87(q), 2016 N.J. PUC LEXIS 58 (Feb. 24. 2106) (hereinafter, "True Green").

In True Green, the BPU modified the "date of designation" from its prior order for a solar project upon the petition for extension by the owner of the project. The petition filed by True Green indicated delays which were beyond its control which included a severe winter storm and non-delivery of racking from its first manufacturer. In addition, the petitioner represented that it had expended over 7 million dollars towards contracts, and that all major equipment had been ordered and paid for. Ultimately, the BPU concluded that "considerations of equity support[ed] a modification of the date of designation." Id.

In another case, after the BPU denied a similar extension of a deadline to complete a solar project, a New Jersey appellate court remanded the matter to the BPU for reconsideration.

*See* <u>In the Matter of the Implementation of L. 2012, C. 24, The Solar Act of 2012; in the Matter of the Implementation of L. 2012, C. 24 N.J.S.A. § 48:3-87(Q)(R) and (S)- Proceedings to Establish the Processes for Designing Certain Grid-Supply Projects as Connected to the Distribution System; Brickyard, LLC</u>, 2017 WL 4700553 (Oct. 20, 2017)(hereinafter, "Brickyard"). The appellate court remanded the matter on the basis that the BPU failed to apply the same considerations to Brickyard's application to extend the time as it did in <u>True Green</u>. Implicit in this decision is the tacit acceptance of the BPU's discretion to grant such an extension.

ISE distinguishes the <u>True Green</u> decision and <u>Brickyard</u> opinion, arguing that each BPU decision was made prior to the Amendment. ISE asserts that the Amendment set a statutory deadline of May 31, 2018 which removed the BPU's discretion to further extend. We disagree. The Amendment was "notwithstanding" the provisions of the already existing N.J.S.A. § 48:87-3(q)(2) - the subsection from which the BPU's discretion arises. It would do nothing to affect, for example, a project with a date of designation allowing for a deadline after May 31, 2018. The Amendment merely extends the deadline for certain projects. It does not contain language which voids the designation should the May 31, 2018 deadline be missed. The voiding of a designation remains under the purview of subsection (q)(2). Since the BPU has discretion to extend under subsection (q)(2), the Amendment cannot be viewed as an absolute deadline.

While the BPU still <u>may</u> utilize its discretion, this Court does not see the reasonable likelihood that the BPU <u>will</u> extend the deadline beyond May 31, 2018 for Moncada. Initially, we note that though the <u>Amendment</u> may not have removed the BPU's discretion, the language of the pre-Amendment Act raises some questions as to the BPU's ability to extend the deadline any further. The Act covered energy years 2014, 2015 and 2016. An energy year ("EY") is the

12-month period from June 1 through May 31, numbered according to the calendar year in which it ends. N.J.S.A. § 48:3-51. Moncada's application was under EY 2016, which ended on May 31, 2016.

The Green Tree decision noted that the date of designation for the projects under EY 2015 and 2016 ran from the start of those EYs, or June 1, 2014 (EY 2015) and June 1, 2015 (EY 2016). Thus, the EY 2015 projects had a deadline of May 31, 2016 to commence commercial operations and the EY 2016 projects (including Moncada) had a deadline of May 31, 2017 to commence commercial operations. In True Green, the SubQ Award was under EY 2014. The date of designation for that project was February 14, 2014. The owner only sought an extension to the end of EY 2014, or May 31, 2014, specifically making the argument that "the [BPU] may designate any date within the energy year." True Green at p. 5 (emphasis added).

In this case, the Moncada SubQ Award fell under EY 2016. The last day of that EY would be May 31, 2016. Thus, even if the BPU amended the date of designation to the end of EY 2016, the two-year deadline would expire by May 31, 2018. Pursuant to the Amendment, Moncada already has until that date to commence commercial operations, and it cannot do so. Petitioning the BPU for a further extension based upon its discretion to modify the date of designation would have the effect of asking the BPU to modify said date to a time that falls not only outside of EY 2016, but also outside of the EYs covered by the Act. This seems illogical and inconsistent with the language of the Act. This Court is hesitant to find that the BPU is unable, as a matter of law, to extend that date of designation outside the EY year based upon the present record. That said, we note that it is far from clear that the BPU has discretion to extend solar project completion dates beyond the reach of the Act itself. Moncada has not cited a state

court proceeding where the BPU has extended a deadline beyond the latest date contemplated by the Act. This distinction is a factor in determining that rehabilitation is not reasonably likely.

Even assuming that the BPU has discretion to extend the date of designation outside EY 2016, this Court still finds there is not a reasonable likelihood of rehabilitation. True Green was a wholly distinguishable factual scenario for several reasons. First, the True Green project was able to certify that it had already expended a majority of the production costs for the solar project and were ready to complete the production expeditiously. Here, Moncada has yet to establish it has a contractual right to acquire the land from ISE on which the Project is to be built. Moncada still does not have a final contract with a developer.

Second, the delays in True Green were caused by issues outside the control of the owner. For instance, the manufacturer of the racking was unable to deliver by its contractual date due to a toxic spill and hurricane effects, which it believed fell under the "Force Majeure" clause of the contract. Additionally, a major winter storm halted construction for an extended period of time. While Moncada has been beset by understandably frustrating delays, the delays were not extraordinary issues, but rather contractual and permitting issues which were not outside the control of Moncada. To the extent that ISE's alleged breach of the Contract prevented Moncada from continuing development of the Project and caused Moncada to lose the SubQ Award, ISE may be liable to Moncada for damages. These contractual issues are best resolved in the state court.

Third, the deadline in True Green was extended by only 3 months. Here, Moncada has already been given a statutory extension of one year, and now would be asking for even more time beyond that year period. Moncada would need an extension beyond the outside date contemplated in the Act and Amendment.

Finally, Moncada argues that the New Jersey legislature may still extend the deadline by statute, as it did through the Amendment. This argument is unavailing. We begin any interpretation of a provision of a statute by looking at its language. The Third Circuit has labeled this as the "cardinal canon of statutory interpretation." *See* In re Philadelphia Newspapers, LLC, 599 F.3d 298, 304 (3d Cir. 2010). "[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then this first canon is also the last: judicial inquiry is complete." Id. (citing Conn. Nat'l Bank v. Germain, 503 U.S. 249, 253-54, 112 S.Ct. 1146 (1992)). Where the statutory language is unambiguous, the court should not consider statutory purpose or legislative history. Id. (citing AT&T, Inc. v. F.C.C., 582 F.3d 490, 498 (3d Cir. 2009)). Asking courts to make determinations as to what they believe legislatures may do in the future opens a dangerous door for obvious reasons. This Court will not read any such tea leaves.

For these reasons, we find that it is not reasonably likely that Moncada will be able to obtain a modification of the date of designation from the BPU which would in turn give it time past May 31, 2018 to commence commercial operations.

Automatic Stay

Moncada alternatively asserts that the provisions of the automatic stay prevent the BPU from terminating the SubQ Award. The filing of a Chapter 11 petition "operates as a stay, applicable to all entities" of a variety of acts. 11 U.S.C. § 362(a). Relevant to this matter, the stay applies to "the commencement or continuation . . . of a judicial, administrative, or other action or proceeding against the Debtor that was or could have been commenced before the commencement of the case," 11 U.S.C. § 362(a)(1); "any act . . . to exercise control over property of the estate," 11 U.S.C. § 362(a)(3); "any act to create, perfect, or enforce any lien

against property of the estate," 11 U.S.C. § 362(a)(4); and "any act to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title." 11 U.S.C. § 362(a)(5).

Moncada contends that the termination of the SubQ Award would be a violation of the automatic stay as the continuation of an administrative proceeding. "It is black letter law that administrative licensing revocation proceedings are subject to the automatic stay." *See* In re North, 128 B.R. 592, 599 (Bankr. D. Vt. 1991) (continuation of administrative order suspending chiropractic license violation of stay). But, no revocation proceedings by the BPU are required when the SubQ Award expires on a date certain pursuant to the Amendment. Moncada points to the fact that no action was taken between May 31, 2017 when the SubQ Award was set to expire, and July 2017, when the Amendment, which extended the deadline, was signed into law. In Moncada's estimation, the non-action on the part of the BPU during that time period after May 31 evidences that an "action or proceeding" would be necessary to effectuate such termination, and would be in violation of the automatic stay.

However, the lack of any official notice of termination from the BPU after May 31, 2017 does not evidence that the BPU would be required to take action to terminate the SubQ Award. Such an interpretation would conflict with the language of the Act, which nullifies the award after two years from the date of designation by its own terms. The cancellation would not be the result of the commencement or continuation of any action or proceeding against Moncada, because no action is necessary.

Similarly, Moncada cites to distinguishable caselaw relating to the revocation of licenses in support of its theory that the termination of the award would be an act to exercise control over property of the estate under § 362(a)(3). *See* In re NextWave Personal Communications Inc.,

244 B.R. 253 (Bankr. S.D.N.Y. 2000) (FCC cancellation of licenses for broadband personal communications service was in violation of automatic stay); In re Burgess, 234 B.R. 793 (D. Nev. 1999) (revocation of brothel license would destroy estate); In re National Cattle Congress, Inc., 179 B.R. 588 (Bankr. N.D. Iowa 1995) (post-petition revocation resolution of dog racing license violated automatic stay).  These cases may be distinguished by the fact that there were affirmative acts taken by each of the violators.  In In re National Cattle the state commission specifically considered the debtor's racing license and made the affirmative decision to revoke said license.  In re National Cattle Congress, Inc., 179 B.R. at 591.  The In re Burgess case also involved the state taking specific action to revoke the debtor's brothel license at a post-petition hearing.  In re Burgess, 234 B.R. at 795.

Moncada relies heavily on the In re NextWave case.  In that case, the FCC relied on a regulation which provided:

> (iv) Any eligible entity that submits an installment payment after the due date but fails to pay any late fee, interest or principal at the close of the 90-day non-delinquency period and subsequent automatic grace period, if such grace period is available, will be declared in default, its license will automatically cancel, and will be subject to debt collection procedures.

In re NextWave Personal Communications Inc., 244 B.R. at 264 (citing 47 C.F.R. § 2110(f)(4)(iv)).  That court found that "[t]here is substantial authority holding that regulatory provisions which interfere with property of a debtor's estate, even by 'automatic' operation of the regulation, violate the automatic stay."  Id. at 272.  An "automatic cancellation of a debtor's property rights by reason of any default would itself violate the automatic stay."  Id.  The In re NextWave court also considered the discretion of the agency, finding that if said agency "has sufficient discretion to . . . extend grace periods and grant waivers in the cases of individual

licensees, then the contention that the automatic cancellation provision involves no agency discretion is untenable." Id. at 265.

The language of the Act differs from the regulation in In re NextWave in one key aspect. The regulation in the latter requires a declaration of default. The NextWave court noted that "[t]he regulation involved requires the FCC to do something (declare a default)." Id. In that case, the cancellation "may be 'automatic,' but it must nevertheless be invoked. It is that invocation, on January 12, 2000, which is the subject of the debtors' motion." Id. at 265-66. As in In re Burgess and In re National Cattle, there was an action required by an agency. The Act requires no such action on the part of the BPU - the SubQ Award is "deemed to be null and void" by operation of the statute without any declaration or revocation.

Moncada's final argument regarding the applicability of the stay pursuant to 11 U.S.C. §§ 362(a)(4) & (5) is similarly without merit. Moncada posits that the State of New Jersey effectively has a lien on the escrow placed at the time of the SubQ Award. If the SubQ Award is cancelled, the Escrow Deposit would be forfeit, which, in Moncada's estimation, would be an act to enforce a lien and exercise control over property of the estate.

As noted by ISE, the Escrow Deposit upon which Moncada bases its theory was posted by a non-debtor, Hanwha Q Cells USA Corp. ("Hanwha"). The escrow agreement between Hanwha and the BPU explicitly stated that "[a]ll funds deposited in the escrow account shall not be considered an asset of [Hanwha] and shall not be available to any creditor of [Hanwha] in the event of bankruptcy . . ." Moncada did not list the Escrow Deposit on its schedule of assets, despite the fact that it listed other deposits and escrow accounts. The Escrow Deposit cannot be considered property of the Moncada debtor estate, as it is difficult to fashion a legal theory under which Moncada has any interest in an escrow posted by a third-party which specifically

acknowledges that the escrow is not even the property of that third-party. Therefore, 11 U.S.C. §§ 362(a)(4) & (5) are not implicated.

This Court is persuaded that when analyzing the effect of the bankruptcy filing on Moncada's May 31 deadline, 11 U.S.C. § 108(b) is implicated. That statute provides:

> [I]f applicable nonbankruptcy law . . . fixes a period within which the debtor . . . may . . . cure a default or perform any other similar act, and such period has not expired before the date of the filing of the petition, the trustee may only file, cure, or perform as the case may be, before the later of-
> (1) the end of such period, including any suspension of such period occurring on or after the commencement of the case; or
> (2) 60 days after the order for relief.

11 U.S.C. § 108(b). Here, the applicable non-bankruptcy law, in this case the Amendment, fixes the time in which Moncada may commence commercial operations, May 31, 2018. Obviously that period did not expire prior to the petition. Therefore, Moncada may only cure before the end of such period, May 31, 2018, as it is later than 60 days after the bankruptcy. It cannot do so.

For these reasons, the Court finds that the automatic stay provisions of the Code in this case do not protect against the statutory cancellation of Moncada's SubQ Award on May 31, 2018, and therefore there is no reasonable likelihood of Moncada's rehabilitation.

Termination of Land Contract

In the alternative, ISE contends that even if it is reasonably likely that Moncada will be able to extend the time in which it must comply with the Act, rehabilitation is still impossible due to the cancellation of the Contract between ISE and Moncada.

Because the Court has concluded that it is not reasonably likely that Moncada will be able to extend the time in which it must comply with the Act, we need not reach the issue of

whether the Contract was validly terminated. Said issue implicates New Jersey state law and is more appropriately decided in the New Jersey state court forum.

## Conclusion

The Court finds that because it is not likely that Moncada will be able to comply with the provisions of the Act as written, it is not reasonably likely that Moncada will be able to rehabilitate through this bankruptcy filing. The case is hereby dismissed.

Dated: December 19, 2017                    **/s/Christine M. Gravelle**
                                             United States Bankruptcy Judge